AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California



FILED
SEP 25 2019
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black TW801 cellular phone; Serial Number: TW80110319017039; MEID HEX: 99001220103774; MEID DEC: 256691868801062772 ("Target Device 1") | Case No. **19MJ10861** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference

located in the _____ Southern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952 and 960 | Importation of Fentanyl, Methamphetamine, and Heroin |

The application is based on these facts:

See attached Affidavit of Special Agent Christian Sanders

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Christian Sanders, Dep't of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/25/19

*Judge's signature*

City and state: El Centro, CA        Hon. Ruth B. Montenegro, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

### PROPERTY TO BE SEARCHED

The following property is to be searched:

> Black TW801 cellular phone
> Serial Number: TW80110319017039
> MEID HEX: 99001220103774
> MEID DEC: 256691868801062772
> (**"Target Device 1"**)

**Target Device 1** is currently in the possession of the Homeland Security Investigations, Assistant Special Agent in Charge Calexico, 2051 North Waterman Avenue, El Centro, California, 92243.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A-1, A-2, A-3 and A-4 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of June 1, 2019 to August 27, 2019:

    a. tending to indicate efforts to import controlled substances from Mexico into the United States;

    b. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

    d. tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the subject phone; or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

which are evidence of violations of Title 21, United States Code, Sections 952 and 960.

## AFFIDAVIT IN SUPPORT OF WARRANT

I, Christian Sanders, being duly sworn, hereby state as follows:

### INTRODUCTION

1. This affidavit supports an application for warrant to search the following electronic devices (**Target Devices**): a black TW801 cellular phone, Serial Number: TW80110319017039, MEID HEX: 99001220103774, MEID DEC: 256691868801062772 ("**Target Device 1**"), a black Soho Style cellular phone, Model number: SSB504A, IMEI 1: 359637043670336, IMEI 2: 359637043670344 ("**Target Device 2**"), a black iPhone cellular phone with unknown model number and IMEI ("**Target Device 3**"), and a blue LG cellular phone, Model number: LG-Q710PL, MEID: 089466496901266711 ("**Target Device 4**") as described in Attachments A-1, A-2, A-3, and A-4 respectively (incorporated herein by reference), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952 and 960.

2. The **Target Devices** were seized from Tiffany Renee SCHMIDT ("SCHMIDT"), John CARRIGAN ("CARRIGAN"), and Kristofer BOWERS ("BOWERS") incident to their arrest for violation of Title 21, United States Code, Sections 952 and 960, Importation of a Controlled Substance, at the Calexico, California West Port of Entry on August 26, 2019. The **Target Devices** are currently in the possession of the Assistant Special Agent in Charge ("ASAC") Calexico, 2051 North Waterman Avenue, El Centro, California, 92243 in the Seized Property Vault.

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachment B (incorporated herein by reference.)

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but

1

only contains those facts believed to be necessary to establish probable cause. Dates, times, and amounts are approximate.

## EXPERIENCE AND TRAINING

5. I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I am also cross-designated to conduct Title 21 investigations and am currently assigned to the Imperial Valley Border Enforcement Security Task Force (IV-BEST). I have been involved with investigations for Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the Drug Enforcement Administration ("DEA") and ICE.

6. I have been employed as a Special Agent with HSI since June 2015. I have received criminal investigative training, including twenty-six weeks at the Federal Law Enforcement Training Center. As a result of my training and experience as a Special Agent, I am familiar with federal criminal statutes to include violations of Title 18, 21, and 31 of the United States Code.

7. As a Special Agent with HSI, my primary duties include the investigation of narcotics-related violations of Title 21 of the United States Code. I have participated in and conducted investigations of violations of various Federal criminal laws, including distribution of controlled substances, use of a communication facilities to commit narcotic offenses, importation of controlled substances, conspiracy to import, possess and distribute controlled substances, bulk cash smuggling, and money laundering, all in violation of Titles 18, 21, and 31, of the United States Code and various California Health and Safety Code and California Penal Code sections. These investigations resulted in arrests of individuals who have imported, smuggled, received and distributed controlled substances. These investigations have also resulted in seizures of bulk cash, property, assets, and controlled substances. Through these investigations and training, I am familiar with the operations of illegal international Drug Trafficking Organizations (DTO) and Money Laundering Organizations (MLO) in in the United States and abroad.

2

8. Based on my experience and training, I am familiar with the methods utilized in narcotics-trafficking operations and the trafficking patterns employed by narcotics organizations. I am also familiar with the various laundering methods utilized by these organizations to move and distribute the proceeds gained from the sales of their narcotics. I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations and the language and patterns of narcotics abuse and trafficking. I know that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I know that professional narcotics operations depend upon maintaining their extensive contacts. The use of telephones is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers. The telephone enables narcotics dealers to maintain contact with narcotics associates, narcotics suppliers, narcotics customers, money brokers, and money launderers. I also know that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

9. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

3

    c.    Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d.    Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e.    Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of Border Patrol checkpoints.

    f.    Drug smugglers therefore generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators.

10. Based on my training and experience, including consultations with other law enforcement personnel, I know that drug traffickers commonly use electronic devices such as cellular telephones to store names, telephone numbers, records, drug ledgers, and other information pertaining to drug trafficking activity. I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating narcotics conspiracies that searches of cellular/mobile telephones yields evidence:

    a.    tending to indicate efforts to import controlled substances from Mexico into the United States;

    b.    tending to identify other facilities, storage devices, or services—such as email addresses, IP addresses, phone numbers—that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

4

    c.    tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

    d.    tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the subject phone; or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

11. Based upon my training and experience, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs; use cellular telephones, emails, and text messages to facilitate drug activity. I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without limitation, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, the use of multiple vehicles as conveyances for drugs and drug proceeds, and the installation of false/hidden compartments ("traps") in those vehicles to covertly transport drugs and drug proceeds.

12. I also know from training and experience that drug traffickers periodically change or "drop" their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

13. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers

5

to work in concert with other individuals and to do so by utilizing cellular telephones, pagers and portable radios to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics. Typically, couriers smuggling controlled substances across the border are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Narcotics smugglers and their organizations use cellular and digital telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular and digital telephones.

14. Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

**FACTS SUPPORTING PROBABLE CAUSE**

15. On August 26, 2019, at approximately 7:25 P.M., Tiffany Renee SCHMIDT applied for entry at the Calexico, California West Port of Entry (POE) via the vehicle lanes. SCHMIDT was the driver of the vehicle, a 2019 Ford F-150 bearing California license plate 77830P2 and presented her California driver's license as identification. A United States Customs and Border Protection Officer (CBPO) obtained a negative customs declaration from SCHMIDT. The CBPO noticed SCHMIDT was visibly shaky and nervous. After querying the vehicle, the CBPO received a positive match for the vehicle being stolen. SCHMIDT was escorted to secondary inspection.

16. During secondary inspection, SCHMIDT told CBPOs that the vehicle was a rental and was being rented by the passenger of the vehicle following behind her. John CARRIGAN and Kristofer BOWERS were following behind SCHMIDT in a 2005 Nissan

Xterra bearing California license plate 8KZE921. At this time, CBPOs also escorted CARRIGAN and BOWERS to secondary inspection.

17. In the secondary inspection lot, CBPOs obtained jumper cables for the Ford F-150 as the vehicle had died. As CBPOs attempted to jump start the vehicle, they noticed anomalies with the vehicle's battery. At this time, a Canine Enforcement Officer (CEO) was requested to screen the Ford's battery with their assigned Human and Narcotic Detector Dog (HNDD). The CEO received an alert to the battery. Further inspection resulted in the discovery of four (4) packages, with a combined total weight of 3.60 kilograms (7.92 pounds) containing a substance which tested positive for fentanyl.

18. During a post arrest statement on August 27, 2019, SCHMIDT admitted to getting paid $1,000 by CARRIGAN for transporting narcotics from Mexicali, Baja California, Mexico to California. SCHMIDT also stated that BOWERS' vehicle was supposed to be loaded with narcotics and he was to be paid $1,000 as well. SCHMIDT stated that the three of them traveled down to Mexico from California riding in two different vehicles. CARRIGAN drove the Ford while SCHMIDT rode as a passenger. BOWERS followed behind them as he drove his Nissan. CARRIGAN obtained the Ford vehicle from another friend who rented the vehicle. SCHMIDT stated that her cellular phone was a black "Obama" phone. After SCHMIDT'S post-arrest interview, CBPOs then found SCHMIDT to be carrying internally 2.01 grams (0.00201 kilograms) of fentanyl, 4.69 grams (0.00469 kilograms) of methamphetamine, and 6.38 grams (0.00638 kilograms) of heroin.

19. On August 27, 2019, I conducted an interview with BOWERS. During the interview, BOWERS denied knowing SCHMIDT or ever meeting her. BOWERS also identified **Target Device 4** as belonging to himself.

20. Agents seized the **Target Devices** incident to SCHMIDT, CARRIGAN, and BOWERS' arrest.

21. As part of my investigation, I reviewed crossing history for all three subjects. Crossing records show that both the Ford F-150, bearing California plates 77830P2, and

the Nissan Xterra, bearing California plates 8KZE921, have only two crossings each. One crossing shows both vehicles crossed southbound into Mexico on August 25th within seconds of each other. The records also indicate the two vehicles crossed northbound into the United States within seconds of each other on August 26th. Furthermore, crossing photos depicted the southbound crossing into Mexico of the Ford F-150 through the Calexico West POE on August 25th. In the photo, a male driver, who appears to be CARRIGAN, is driving the Ford F-150 while the Nissan follows closely behind.

22.     Crossing records for the last 18 months indicated that SCHMIDT had only three crossings total dating back to July 27, 2019. One of those crossings was with the Ford bearing California plate 77830P2. SCHMIDT's second crossing was on August 14, 2019 in a vehicle bearing California plate 29948S2. SCHMIDT's first crossing was on July 27, 2019 in a vehicle bearing California plate 62074D1.

23.     Crossing records for the last 18 months indicated that CARRIGAN had seven crossings, both vehicle and pedestrian, dating back to June 10, 2019. One of those crossings were with the Nissan bearing California plate 8KZE921. Another one of those crossings was with a vehicle bearing California plate 29948S2. Four crossings were in a vehicle bearing California plate 62074D1, which includes the July 27th crossing with SCHMIDT. CARRIGAN also has one pedestrian crossing on June 10, 2019.

24.     Crossing records for the last 18 months indicated that BOWERS only had the one crossing on August 26, 2019 in the Nissan bearing California plate 8KZE921.

25.     Based upon my experience and investigation in this case, I believe that SCHMIDT, CARRIGAN, and BOWERS, as well as other persons, were involved in an ongoing conspiracy to import fentanyl, or some other federally controlled substance into the United States. Based on my experience investigating narcotics smugglers, I also believe that SCHMIDT, CARRIGAN, and BOWERS may have used the **Target Devices** to coordinate with co-conspirators regarding the importation of fentanyl, or some other federally controlled substance into the United States.

26.     Accordingly, based upon my experience and training, consultation with other

8

law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics trafficking activities of SCHMIDT, CARRIGAN, and BOWERS, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, audio files, videos, and other digital information are stored in the memory of the **Target Devices**.

27. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in transporting their valuable cargo to its destination within the United States. Given this, I request permission to search the Target Device for items listed in Attachment B beginning on **June 1, 2019 up to and including August 27, 2019**. That date range is based, in part, on the defendants' and vehicles' crossing histories. Additionally, based on my training and experience, SCHMIDT, CARRIGAN, and/ or BOWERS likely would have been in communication with co-conspirators to plan and coordinate their smuggling attempts, including acquiring the Vehicles, in the two months leading up to their arrest.

## METHODOLOGY

28. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard

drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

31. Based on all of the facts and circumstances described above, there is probable cause to conclude that SCHMIDT, CARRIGAN, and BOWERS used the **Target Devices** to facilitate violations of Title 21, United States Code, Sections 952 and 960.

32. Because the **Target Devices** were promptly seized during the investigation of SCHMIDT, CARRIGAN, and BOWERS trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by SCHMIDT, CARRIGAN, and BOWERS continues to exist on the **Target Devices**.

33. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the

1 | item described in Attachment A-1, A-2, A-3 and A-4 and the seizure of items listed in
2 | Attachment B, using the methodology described above.
3 | I swear the foregoing is true and correct to the best of my knowledge and belief.

Christian Sanders
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this ___25th___ day of September, 2019.

The Honorable Ruth B. Montenegro
United States Magistrate Judge

11